UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MILLEDGE A. HART, III and<br>LINDA W. HART | §<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| VS. | §<br>§ | CIVIL ACTION NO. 3:18-cv-2178-G |
| TUFENKIAN ARTISAN CARPETS<br>d/b/a TUFENKIAN CARPETS<br>DALLAS, LLC | §<br>§<br>§<br>§ | |
| Defendant. | §<br>§ | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

COME NOW Plaintiffs Milledge A. Hart, III and Linda W. Hart (collectively, the "Harts") and file their Second Amended Complaint against Defendant Tufenkian Artisan Carpets d/b/a Tufenkian Carpets Dallas, LLC ("Tufenkian") and would respectfully show this Court as follows:

### I.
### PARTIES

1. Plaintiffs Milledge A. Hart, III and Linda W. Hart are citizens of Texas.

2. Defendant Tufenkian is a Texas limited liability company with an address at 919 3rd Ave Frnt 1, New York, NY 10022. Tufenkian's sole member, James Tufenkian, is a citizen of New York. Tufenkian has appeared in this matter.

### II.
### JURISDICTION AND VENUE

3. The Court has diversity jurisdiction over this action pursuant to 28

U.S.C. § 1332 because there is complete diversity of citizenship between the parties. The amount in controversy exceeds $75,000 exclusive of interest and costs.

4. Venue is proper in this District. All or a substantial part of the events or omissions giving rise to the claims between the parties occurred in Dallas, Texas.

## III.
## BACKGROUND FACTS

5. According to its website, Tufenkian produces nearly 1,000 custom rugs each year and is "the leading source for quality designer carpets and hand-crafted rugs in various styles." Tufenkian's Custom Rug Program gives its customers "the freedom and flexibility to design the perfect handmade carpet with a process that is fast, simple, and limited only by [its customer's] imagination." Along with its "international reputation for exquisite design, craftsmanship, and customer service," Tufenkian proclaims that it "refuse[s] to cut corners."

6. In the summer and fall of 2017, the Harts and their representatives examined rug samples located at Tufenkian's showroom in Dallas, Texas. The Harts also viewed rugs in their Dallas office and in the home where the rugs were planned to be installed.

7. In early October, Joseph Toliver, the Harts' representative, made clear to Tory Sommerfeldt, a Tufenkian employee, that the Harts' remodeling plan was centered entirely on the rugs, and that the rugs had to be delivered no later than April 1, 2018. Every fabric chosen in the remodeling plan was based on the rugs.

8.     Mr. Toliver also told Ms. Sommerfeldt that the Harts would only place orders for the remodeling plans if the rugs could be guaranteed – in terms of patterns, colors, texture, quality, and delivery time.

9.     Ms. Sommerfeldt represented that, if the Harts purchased rugs, the showroom samples would be sent to "the factory" to ensure the produced rugs would match the samples. On October 13, 2017, for example, Ms. Sommerfeldt made clear to Marco French, also the Harts' representative, that the dye lots used in making the rugs would match the sample rugs that the Harts had viewed. The Harts ordered the rugs relying on the representation that the patterns, colors, texture, and quality demonstrated in the showroom samples in Dallas would match the rugs they would receive.

10.    The quotation contract process for the rugs went through up to ten iterations. Mr. French told Ms. Sommerfeldt that any quotation contract that did not require strike offs would be flatly rejected. As he pointed out "How can we have final approval without the strikeoffs?" Strike offs are production samples for a customer to review and approve the patterns, colors, texture, and quality of the rugs prior to full production. Tufenkian states on its website that "[s]trike-off samples . . . take the worry out of ordering your final creation, and are provided in four to six weeks."

11.    One of the ten iterations of the quotation contract for the rugs did *not* contain a provision for strike offs and was immediately rejected. After several more iterations, the Harts accepted and signed a quotation contract that included a

provision for strike offs—requiring Tufenkian to provide the Harts with strike offs of the ordered rugs for approval ***prior to full production***.  Ms. Sommerfeldt signed the quotation contract on behalf of Tufenkian.

12.   Contemporaneous with the execution and delivery of the signed quotation contract, the Harts paid Tufenkian more than $130,000 by check as a deposit on the rugs.  The Harts' check specifically stated that payment was being made in reliance on the guarantees by Tufenkian, and Ms. Sommerfeldt guaranteed in writing that the rugs would be delivered by April 1, 2018.

13.   ***After*** the rug order was placed, the Harts placed purchase orders related to the rest of the remodeling plan (furniture, fabrics, etc.) all of which were based around the rugs.

14.   When the Harts received the strike offs in late-December 2017, it was clear that two rugs—the Ven Tides and Sierra Red—were ***not*** the same patterns, colors, texture, or quality as the showroom samples.  In fact, the strike offs were clearly of a lesser quality, had different loop lengths and textures, were different colors, and were not even the same pattern as the samples that the Harts had relied on.  As a result, the Harts rejected the strike offs for the Ven Tides and Sierra Red rugs.

15.   It was only after the Harts rejected these two strike offs that Tufenkian took the curious position that it was not required to send strike offs to the Harts for approval.  The quotation contract clearly required that strike offs be provided to the Harts.  Tufenkian's website also makes it clear that strike offs are

provided to the customer for approval, which is consistent with how those in the design industry understand strike offs.

16. The Harts demanded Tufenkian retrieve the showroom samples from "the factory" to compare with the strike offs. Tufenkian confessed it could not find the samples. The Harts eventually learned the showroom samples—*the basis for the final rugs and the reason that the Harts entered into the quotation contract and entered into purchase orders for the other items in the remodeling plan*—were never sent to "the factory." This is true despite Ms. Sommerfeldt's representation to Mr. French "we are going to match our dye lots to the samples" on October 13, 2017.

17. When Tufenkian finally located the showroom samples, it was abundantly clear the strike offs for the Ven Tides and Sierra Red rugs were completely different in patterns, colors, texture, and quality. In fact, with respect to the Ven Tides, Tufenkian recognized that the combination of texture and color variations from the samples the Harts viewed could cause the Harts concern.

18. Tufenkian offered to make the Ven Tides and Sierra Red carpets in the patterns, colors, texture, and quality that the Harts had ordered, but the production process would take several more months and could not meet the Harts' critical deadline. In short, Tufenkian's actions and inactions made it impossible for it to perform its contractual obligations and deliver the proper rugs to the Harts by April 1, 2018.

19.     The Harts, concerned with the patterns, colors, texture, and quality of the strike offs, needed to view all of the rugs before delivery.  Tufenkian and the Harts agreed that the April 1, 2018 date would be extended so the Harts could view the rugs in the Dallas showroom.

20.     On April 17, 2018, the Harts and their representatives met with Tufenkian's attorney at the Tufenkian showroom in Dallas to review the produced rugs.  As soon as the first rug was unrolled, it was clear Tufenkian had fully failed to live up to its promises.  Not only were the Ven Tides and Sierra Red rugs still incorrect, but practically every other finished rug also failed to match the promised specifications.

21.     For example, the full Ven Tides rug (left) was not the same quality, texture, or color as the sample (right):





Actual – left; Sample – right



Actual – left; Sample – right

**PLAINTIFFS' SECOND AMENDED COMPLAINT**	Page 7

The Sierra Red Rug had a very limited amount of red and was not the same quality, texture, or color as the sample:




Actual – left; Rendering – right



Actual – left; Sample – right

**PLAINTIFFS' SECOND AMENDED COMPLAINT**                                                        Page 8

22. After the fact, Tufkenian recommended that the Harts look at the ***back of the rug*** to see the red in the rug. The Harts did not intend to use the rug face down.

23. Two Moonscape Malachite rugs are hardly recognizable from the rendering to the actual version of the rugs. They are also not the same quality or texture as the sample:



Actual – left; Rendering – right



Actual – left; Sample – right

**PLAINTIFFS' SECOND AMENDED COMPLAINT**                                         Page 9



Actual – left; Sample – right

24. The Luminance rug does not match the rendering and the quality is not what was represented to the Harts.

 

Actual – left; Rendering – right



Actual (frayed edges and loose threads)

**PLAINTIFFS' SECOND AMENDED COMPLAINT** Page 11



This rug also appears to have been woven on different looms or with a different method - there is a clear demarcation line where the quality of the rug changes (and neither quality is what was represented by Tufenkian).

25. The Nouvelle rug does not meet the quality that was represented by Tufenkian and does not match the rendering:

 

Actual – left; Rendering - right

26. The rugs were to be installed all together. Therefore, they were only intended to be purchased together. The Harts were not shown the Firewood rug so they are unaware of its patterns, colors, texture, or quality. However, because the remodeling plan was created around all of the rugs, it would not work with just a single rug.

27. The Harts rejected the rugs based on Tufenkian's failure to live up to its promises and breach of contract.

# IV.
# CAUSES OF ACTION

**A.     Violation of the Texas Deceptive Trade Practices Act.**

28. The foregoing paragraphs are realleged and incorporated herein by reference.

29. The Deceptive Trade Practices Act ("DTPA") is liberally construed and applied to promote its purpose of protecting consumers from false, misleading, or deceptive business practices, unconscionable actions, and breaches of warranty. TEX. BUS. & COM. CODE § 17.44(a).

30. To prove a cause of action under the DTPA, a plaintiff must show: (i) the plaintiff is a consumer; (ii) the defendant can be sued under the DTPA; (iii) the defendant committed a wrongful act covered by the DTPA; and (iv) the defendant's action was a producing cause of the plaintiff's damages. TEX. BUS. & COM. CODE §§ 17.41-17.63.

31. The Harts are "consumers" as defined by the DTPA because they sought and/or purchased goods and services from Tufenkian in the form of artisan rugs for their home. TEX. BUS. & COM. CODE § 17.45(4).

32. Tufenkian is liable under the DTPA because it is a "person" under the DTPA and it committed a deceptive act or practice in connection with the Harts' purchase of the rugs. TEX. BUS. & COM. CODE §§ 17.45(3), 17.50(a)(1); *Brown & Brown v. Omni Metals, Inc.*, 317 S.W.3d 361, 397 (Tex. App.—Houston [1st Dist.]

2010, pet. denied) (DTPA recognizes typical common-law theories of vicarious liability, such as agency and respondeat superior).  Tufenkian is not exempted from liability under the DTPA according to TEX. BUS. & COM. CODE § 17.49 or any other statute.

33.     Tufenkian's deceptive acts and practices constitute violations of the DTPA's "laundry list," which sets forth specific acts and practices that are considered false, misleading, or deceptive.  Courts interpret the "laundry list" broadly to fulfill the DTPA's purpose of protecting consumers from false trade practices. *Pennington v. Singleton*, 606 S.W.2d 682, 688 (Tex. 1980); TEX. BUS. & COM. CODE § 17.46(b).

34.     Specifically, Tufenkian: (i) affirmatively misrepresented the rugs' characteristics and qualities [§ 17.46(b)(5)]; (ii) affirmatively misrepresented that the rugs were of a particular standard, quality, or grade that they are not [§ 17.46(b)(7)]; and (iii) caused confusion and misunderstanding about the approval of the strike offs prior to full production of the rugs [§ 17.46(b)(2)].

35.     Tufenkian represented that the quality of the rugs would be similar to those in the showroom.  Put simply, they weren't.  The rugs are of an inferior quality; they are also not the represented patterns, colors, or textures.

36.     Further, the Harts and their representatives made clear that strike offs were necessary.  Yet, only after the Harts rejected the strike offs did Tufenkian take the position that, despite having strike offs in the order, no strike offs were necessary or the strike offs were pointless and not for approval.

37. The Harts detrimentally relied on Tufenkian's false and deceptive representations by placing numerous purchase orders for other items for their remodeling plan based specifically around the rugs *after* ordering the rugs from Tufenkian based on its misrepresented promise of quality, characteristics, texture, patterns, colors, and delivery.

38. Because of Tufenkian's own actions, it was impossible for Tufenkian to deliver the Harts' entire rug order by April 1, 2018 in the proper quality, texture, colors, and patterns as the showroom samples.

39. As a result, the Harts are damaged.

40. The Harts provided Tufenkian with notice of their claims under DTPA by letter dated May 22, 2018, which is more than sixty days prior to the filing of this Second Amended Complaint. TEX. BUS. & COM. CODE § 17.505(a).

**B.    Breach of Contract.**

41. The foregoing paragraphs are realleged and incorporated herein by reference.

42. The quotation contract is a valid and enforceable contract.

43. Tufenkian breached the contract when, by its own voluntary acts, Tufenkian made it impossible to provide the Harts' rugs in the proper patterns, colors, texture, and quality by the critical and conspicuous deadline of April 1, 2018, which was then extended to April 17, 2018.

44. Tufenkian breached the contract when it presented finished rugs that did not match the patterns, colors, texture, and quality that Tufenkian contractually agreed to deliver.

45. The Harts have been damaged because Tufenkian did not provide the rugs the Harts ordered in the proper patterns, colors, texture, and quality by the contractual deadline or the extended deadline.

46. The Harts seek actual damages in economic damages for breach of contract, including but not limited to return of the Harts' deposit, as well as court costs, pre-judgment and post-judgment interest at the maximum rates allowed by law, and attorney's fees.

**C.     Promissory Estoppel.**

47. The foregoing paragraphs are realleged and incorporated herein by reference.

48. Tufenkian promised the Harts it would provide rugs with certain patterns, colors, texture, and quality by a certain deadline. The Harts reasonably and substantially relied on Tufenkian's promise to their detriment by paying Tufenkian over $130,000 and by placing purchase orders for the rest of the remodeling plan items based on Tufenkian's promise.

49. The Harts' reliance was foreseeable by Tufenkian because the Harts expressly told Tufenkian about the remodeling plan, which was centered on the rugs. Injustice can only be avoided by applying promissory estoppel to Tufenkian's promise.

50. The Harts seek actual damages in reliance damages, including but not limited to return of the Harts' deposit and reliance-interest damages for the purchase orders for other items in the remodeling plan made in reliance on Tufenkian's promises, as well as court costs, pre-judgment and post-judgment interest at the maximum rates allowed by law, and attorney's fees.

**D.    Attorney's Fees.**

51. As a result of Tufenkian's actions, the Harts have retained Haynes and Boone, LLP to represent them in this lawsuit. The Harts have agreed to pay Haynes and Boone, LLP its reasonable hourly fee for its services.

52. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and the DTPA, the Harts are entitled to recover their reasonable attorney's fees and costs incurred in prosecution of their claims.

## V.
## CONDITIONS PRECEDENT

53. All conditions precedent to the Harts' recovery against Tufenkian have been performed or have occurred.

## VI.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Harts respectfully request that Tufenkian be cited to appear and answer according to law and judgment be entered against Tufenkian for:

(1)    all actual, economic, and reliance damages for the Harts' claims in this action;

  (2)  pre-judgment and post-judgment interest as provided by law;

  (3)  reasonable attorney's fees and expenses;

  (4)  costs of suit; and

  (5)  such other and further relief to which the Harts may show themselves justly entitled.

            Respectfully submitted,

            */s/ Aimee M. Furness*
            Aimee M. Furness
            State Bar No. 24026882
            aimee.furness@haynesboone.com
            K. Virginia Burke
            State Bar No. 24097437
            virginia.burke@haynesboone.com

            HAYNES AND BOONE, LLP
            2323 Victory Avenue, Suite 700
            Dallas, Texas 75219
            Telephone: 214-651-5000
            Telecopier: 214-651-5940

            **ATTORNEYS FOR PLAINTIFFS**
            **MILLEDGE A. HART, III AND**
            **LINDA W. HART**

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that a true and correct copy of the foregoing instrument was served on counsel for Defendant in accordance with the Federal Rules of Civil Procedure on September 19, 2018:

    **Blake A. Bailey**
    PHELPS DUNBAR LLP
    Southlake Town Square
    115 Grand Avenue, Suite 222
    Southlake, Texas 76092-7629
    blake.bailey@phelps.com

                                                */s/ Aimee M. Furness*
                                                Aimee M. Furness